**Orlandus Carr LEONARD, Petitioner,**

v.

**People of the State of MICHIGAN, Respondent.**

No. 1:00–CV–61.

United States District Court, W.D. Michigan, Southern Division.

Feb. 10, 2003.

Orlandus Carr Leonard, Carson City, MI, Pro se.

Randall S. Levine, Levine & Levine, Kalamazoo, MI, for Petitioner.

Debra M. Gagliardi, Mike Cox, Attorney General, Habeas Corpus Division, Lansing, MI, Respondent.

## *REPORT AND RECOMMENDATION*

CARMODY, United States Magistrate Judge.

This matter is before the Court on Leonard's petition for writ of habeas cor-

---

pus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, I recommend that Leonard's petition be **granted.**

### BACKGROUND

Following a 1994 bench trial before the Honorable John F. Foley, Petitioner was convicted of first degree criminal sexual conduct, armed robbery, and breaking and entering, for which he was sentenced to a term of 18–40 years imprisonment. After various facts had been brought to light regarding the unfairness of Petitioner's trial, Judge Foley offered the following about Petitioner's conviction:

> I want to speak on substantial issues on appeal, and I want to say that in my 27 years of practice and my 12 years on the bench considering due process, fairness at trial, this is the greatest miscarriage of justice that I've been connected with and I'm embarrassed to be a part of it ... I start with my errors. My error was to leave ineffective counsel on this case, when I over and over again tried to get him to move, do something to get the expert witness that was needed here. He didn't do it. He didn't do it. Finally we got down to, as it turned out through Mr. Schuck's[1] investigation, there was only a few days before the trial, [defense counsel's] first contact was made with the expert witness and that is the reason, by the way, for the $125 fee. It isn't made very clear that at that time the expert witness was unable to come. He said he would have to drop everything and charge for all his time in the air, all his time, 24 hours a day, $125 to sit in his hotel room.

> That's why I was unable to authorize that.

> Then at the trial when he made his motion to adjourn and certainly indeed a large part of it was to get the expert witness. I want to get to that in a moment. I should have granted that adjournment and I should have then replaced the ineffective counsel.

> What was so important about this expert witness—Court of Appeals is certainly misunderstanding my opinion—I think there is some per se right to have an expert witness, it's in this circumstance, this expert witness, it was very important in this trial and the expert's testimony was very important. Talking [as] the trier of fact here, very important to my decision, and it was a disgrace for this defendant to be there without an expert witness.

> At that time, of course, I can only speculate as to what an expert witness might be able to do, but the State Appellate Defender Office went out and contacted the expert witness, paid for him and we found out at least some of the matters he would have testified to that could indeed have made a difference in the outcome of this trial

> I want to conclude you have no idea as to whether Mr. Leonard committed these acts that he's accused of. All I know is that he never has had a fair trial here and it would be a miscarriage of justice if he is never given a fair trial.

(Bond Motion Transcript, August 27, 1997, 16–18).

On August 5, 1994, Petitioner filed a claim of appeal, challenging his conviction. On December 4, 1994, before the Michigan Court of Appeals had addressed his ap-

---

**1.** F. Michael Schuck represented Petitioner in his post-conviction proceedings in the state courts.

peal, Petitioner filed in the trial court a motion for a new trial, in which he asserted the following claims:

I. DEFENDANT WAS ERRONEOUSLY DENIED THE APPOINTMENT OF AN EXPERT ON DNA ANALYSIS.

II. THE TRIAL COURT ERRONEOUSLY DENIED DEFENDANT A CONTINUANCE TO OBTAIN A NECESSARY EXPERT AND SO DENIED DEFENDANT THE EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR TRIAL.

III. DEFENDANT'S TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO OBTAIN A NECESSARY DNA EXPERT FOR PREPARATION AND TRIAL AND IN FAILING TO CONTACT AND CALL ALIBI WITNESSES.

IV. DEFENDANT'S PURPORTED WAIVER OF A JURY WAS UNINTELLIGENT AND INVOLUNTARY WHERE THE COURT FAILED TO EXPLAIN THE NATURE OF THE RIGHT AND FAILED TO ASK ANY QUESTIONS ON VOLUNTARINESS AS TO PROMISES OR THREATS.

The trial court held a hearing on Petitioner's motion for new trial on June 6, 1995. Judge Foley *granted* Petitioner's motion for a new trial, stating that:

All right. I'm prepared to rule at this time. First of all, taking up the—I am going to reserve on the argument of whether there was error in the waiver of jury trial and reserve on the error of whether the alibi defense that's being raised now should call for a new trial. But going to the DNA matter, I had assumed for 1993 and 1994 that we were going to have an expert for the defendant. Counsel was—the history, as I recall, was retained counsel. He retained Dr. Grunbaum. And then I believe it was the family and the defendant ran out of money to be able to support paying the expert and the retained counsel, so we appointed counsel and then there were—as prosecutor stated many chambers conferences, very little on the record, to try to move the case forward

for something to be done about any expert in here and arrangements made. So finally the Court set the motion on to hold what counsel calls the *Frye–Davis* hearing on DNA and I see, according to Doctor Grunbaum's affidavit, he was contacted for the first time in many months—first time from the new appointed counsel—and asked to be here in a week and then that was followed by my talking to the expert.

I gather there was a misunderstanding about the fee. It was in chambers off the record. My understanding is he was going to charge for all his flight time and all his time in the hotels and it was far over our schedule which is allowed for expert witness fees.

So then I put the hearing over to allow defense counsel more time to get another expert. None was obtained. So eventually we just didn't have one forthcoming, so we plunged ahead without one. That, I wasn't too happy about it. But, of course, you never know what's going to happen at trial because DNA would have been only part of the evidence, but it turned out to be the major part of the evidence and indeed I credited the DNA experts. They didn't have any opposition.

And in this new and complicated science of DNA at this stage, not only O.J. Simpson, but every defendant is entitled to have at least one expert to help them out, both to act as advisor and to also testify. That's even over and above, you know, the affidavit of Doctor Grunbaum and so forth.

Just should make another effort to get an expert and retry the case. I'm pleased that the—that with the defense counsel's work that he does have so much work done and would appear if Doctor Grunbaum qualifies as an expert and there really was a misunderstanding

on the fee arrangement, that he could be the one and we could be prepared to go right ahead rather quickly.

So for that reason, I'm going to grant the motion for a new trial.

(Hearing Transcript, June 6, 1995, 33–35).

The State appealed Judge Foley's decision to the Michigan Court of Appeals, which subsequently consolidated it with Petitioner's initial appeal. *People v. Leonard,* No. 178121 and 186776, order (Mich. Ct.App., September 18, 1995). In his subsequent brief in the Michigan Court of Appeals, Petitioner raised the following issues:

I. THE TRIAL COURT DID NOT ERR IN DETERMINING THAT DEFENDANT WAS DENIED A FAIR TRIAL WHERE HE DID NOT HAVE A DNA EXPERT

    A. The Court Denied Defendant The Effective Assistance Of Counsel, His Right To Confrontation, And Due Process In Refusing To Appoint Defendant's Expert

    B. The Court Erroneously Denied Defendant A Continuance To Obtain A Necessary Expert

    C. Counsel was Ineffective

    D. The DNA Evidence Here Was Not Reliable

        1. The Procedures Used Here Were Not Reliable

        2. The DNA Evidence Here Was Inadmissible Because The MSP Protocols Have Never Been Validated By Independent Scientists And So Have Not Been Generally Accepted In The Relevant Scientific Community

        3. The Statistical Evidence Was Also Unreliable and Inadmissible Here

II. THE TRIAL COURT DID NOT COMMIT ANY PROCEDURAL ERRORS IN GRANTING DEFENDANT A NEW TRIAL

    1. The Court Did Not Deny The Prosecutor The Right To Proper Notice and Service

    2. The Court Did Not Erroneously Cut Off The Prosecutor's Argument

    3. The Court Provided Sufficient Findings of Fact

    4. An Evidentiary Hearing Was Unnecessary

    5. Dr. Grunbaum's Affidavit Was Perfectly Proper And Relevant

III. DEFENSE COUNSEL WAS INEFFECTIVE AND DENIED DEFENDANT A FAIR TRIAL

IV. DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE HIS PURPORTED WAIVER OF JURY TRIAL WAS INVALID WHERE THE COURT FAILED TO ESTABLISH THAT THE WAIVER WAS VOLUNTARY AND INTELLIGENT

V. THE PROSECUTOR HAS PRESENTED NO REASON TO DISQUALIFY THE TRIAL COURT

The Michigan Court of Appeals, apparently thinking it knew better than the trial judge sitting as the finder of fact, affirmed Leonard's conviction and reversed the trial court's order granting Petitioner a new trial. *People v. Leonard,* 224 Mich.App. 569, 569 N.W.2d 663 (1997). The court later denied Petitioner's motion for rehearing. *People v. Leonard,* No. 178121 and 186776, order (Mich.Ct.App., November 18, 1997).

Petitioner subsequently applied to the Michigan Supreme Court for leave to appeal, asserting the following claims:

I. THE TRIAL COURT DID NOT ERR IN DETERMINING THAT DEFENDANT WAS DENIED A FAIR TRIAL WHERE HE DID NOT HAVE A DNA EXPERT

    A. The Court Denied Defendant The Effective Assistance Of Counsel, His Right To Confrontation, And

Due Process In Refusing To Appoint Defendant's Expert

B. The Court Erroneously Denied Defendant A Continuance To Obtain A Necessary Expert

C. Counsel was Ineffective

D. The DNA Evidence Here Was Not Reliable

   1. The Procedures Used Here Were Not Reliable

   2. The DNA Evidence Here Was Inadmissible Because The MSP Protocols Have Never Been Validated By Independent Scientists And So Have Not Been Generally Accepted In The Relevant Scientific Community

   3. The Statistical Evidence Was Also Unreliable and Inadmissible Here

II. THE TRIAL COURT DID NOT COMMIT ANY PROCEDURAL ERRORS IN GRANTING DEFENDANT A NEW TRIAL

   1. The Court Did Not Deny The Prosecutor The Right To Proper Notice and Service

   2. The Court Did Not Erroneously Cut Off The Prosecutor's Argument

   3. The Court Provided Sufficient Findings of Fact

   4. An Evidentiary Hearing Was Unnecessary

   5. Dr. Grunbaum's Affidavit Was Perfectly Proper and Relevant

III. DEFENSE COUNSEL WAS INEFFECTIVE AND DENIED DEFENDANT A FAIR TRIAL

IV. DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE HIS PURPORTED WAIVER OF JURY TRIAL WAS INVALID WHERE THE COURT FAILED TO ESTABLISH THAT THE WAIVER WAS VOLUNTARY AND INTELLIGENT

V. THE PROSECUTOR HAS PRESENTED NO REASON TO DISQUALIFY THE TRIAL COURT

Despite the conclusion by three justices that Petitioner's claims deserved to be heard, the Michigan Supreme Court denied Petitioner leave to appeal, *People v. Leonard,* 459 Mich. 894, 587 N.W.2d 285 (1998), a decision which it reaffirmed on reconsideration. *People v. Leonard,* 459 Mich. 894, 590 N.W.2d 64 (1999).

Almost one year later, Leonard filed the present petition for writ of habeas corpus, in which he asserts the following claims:

I. THE TRIAL COURT PROPERLY FOUND THAT DEFENDANT WAS DENIED A FAIR TRIAL IN THAT HE DID NOT HAVE A DNA EXPERT

II. THE TRIAL COURT ERRONEOUSLY DENIED DEFENDANT A CONTINUANCE TO OBTAIN A NECESSARY EXPERT

III. DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL

IV. DEFENDANT WAS ENTITLED TO A NEW TRIAL BECAUSE HIS PURPORTED WAIVER OF JURY TRIAL WAS INVALID

V. THE DNA EVIDENCE WAS NOT RELIABLE

VI. DEFENDANT WAS DENIED RIGHT TO APPEAL

### STANDARD OF REVIEW

Leonard's petition, filed January 25, 2000, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly es-

tablished Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); *see also, Machacek v. Hofbauer,* 213 F.3d 947, 952–53 (6th Cir.2000).

Prior to *Williams,* the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelley,* 205 F.3d 1340, 2000 WL 145144 at *4 (6th Cir.2000); *see also, Blanton v. Elo,* 186 F.3d 712, 714–15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams,* 120 S.Ct. at 1521–22.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 120 S.Ct. at 1522. Rather, the Court must also find the state

court's application thereof to be *objectively* unreasonable. *Williams,* 120 S.Ct. at 1521–23; *see also, Machacek,* 213 F.3d at 953 (emphasis added).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall,* 212 F.3d 940, 943–44 (6th Cir.2000) (citing *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith,* 161 F.3d 358, 360 (6th Cir.1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

### FACTUAL BACKGROUND

In the early morning hours of August 30, 1986, two men unlawfully entered the apartment in which Shirley Martin lived with her boyfriend, William Osborn, and her daughter. (Trial Transcript, May 11, 1994, Dkt. # 18, 33–37; Trial Transcript, May 11, 1994, Dkt. # 17, 3–12). The two men entered the bedroom where the three individuals were sleeping, awakening them. (Trial Transcript, May 11, 1994, Dkt. # 18, 34–37; Trial Transcript, May 11, 1994, Dkt. # 17, 10–12). The two men took Osborn out of the room, after which Martin "got up, shut the door, locked it, [and] tried to get out of the bedroom window for help." (Trial Transcript, May 11, 1994, Dkt. # 18, 37–38; Trial Transcript, May 11, 1994, Dkt. # 17, 11–14).

Before Martin could escape, however, one of the two intruders kicked in the bedroom door, "grabbed" Martin and raped her. (Trial Transcript, May 11, 1994, Dkt. # 18, 38–40; Trial Transcript, May 11, 1994, Dkt. # 17, 15). Because the room was dark, Martin was unable to see this man's face. (Trial Transcript, May 11, 1994, Dkt. # 18, 39, 47). Martin was then taken into the bathroom where the other intruder raped her. (Trial Transcript, May 11, 1994, Dkt. # 18, 40–42). Martin was likewise unable to see this man's face. (Trial Transcript, May 11, 1994, Dkt. # 18, 41, 47).

After the incident ended and the intruders departed, the police were summoned, after which Martin was transported to a hospital to undergo a sexual assault evaluation. (Trial Transcript, May 11, 1994, Dkt. # 18, 42–45; Trial Transcript, May 11, 1994, Dkt. # 17, 3–12; Trial Transcript, May 12, 1994, 7–8). An investigation of Martin's apartment revealed the presence of "several" latent fingerprints. (Trial Transcript, May 12, 1994, 57–58). Police were unable to locate any suspects and the matter was placed into "inactive status" the following spring. *Id.* at 9–14.

In February 1991, however, police were able to identify all but one of the recovered fingerprints as belonging to Eric Schippers. *Id.* at 14–16, 35–36, 58–67. The individual to whom the remaining fingerprint belonged was never identified. *Id.* at 36–39. Subsequent examination revealed that it did not belong to Petitioner. *Id.* at 36–37. Schippers was eventually located and interviewed by Officer David Caswell of the Kalamazoo Township Police Department in August 1991. *Id.* at 17. Schippers denied knowledge of the matter, but Caswell continued his investigation. *Id.* After eliminating "any reason for [Schippers] to have legitimately been in [Martin's apartment] at the time [of the assault]," Caswell obtained an arrest warrant for Schippers, who was arrested in August 1992. *Id.* at 17–18. When he was subsequently questioned about his involvement in the matter, Schippers declined to cooperate and instead requested an attorney. *Id.* at 20–21.

A search warrant was obtained to draw blood from Schippers for purposes of comparison with the evidence obtained from the sexual assault evaluation of Martin. *Id.* at 19. As a result of this comparison, police officials concluded that Schippers had engaged in intercourse with Martin on August 30, 1986. *Id.* Schippers was subsequently charged with (1) first degree criminal sexual conduct, (2) two counts of armed robbery, and (3) breaking and entering. (Preliminary Examination Transcript, August 18, 1992, 78–79). Schippers was informed by his attorney that he faced life imprisonment if convicted on all four charges. *Id.* at 92.

With respect to his desire to locate Schippers' accomplice, Caswell indicated that:

> This is one of the most violent crimes I've ever investigated and I wanted to do whatever I had to do to locate this second suspect and I then made arrangements with the prosecutor's office to negotiate some kind of understanding with Mr. Schippers to help us identify and charge his partner in this offense.

(Trial Transcript, May 12, 1994, 18).

A plea agreement was subsequently negotiated with Schippers pursuant to which Schippers agreed to plead guilty to the charges of first degree criminal sexual conduct and one count of armed robbery, as well as identify and testify against his accomplice. (Preliminary Examination Transcript, August 18, 1992, 78–79; Trial Transcript, May 12, 1994, 19–20). In return, the prosecution agreed to drop the remaining two charges and recommend that Schippers receive a sentence of only

12–30 years. (Preliminary Examination Transcript, August 18, 1992, 79–80; Trial Transcript, May 12, 1994, 19–20).

After negotiating his plea agreement, Schippers agreed to cooperate and identified Petitioner as his accomplice in the assault of Shirley Martin. (Trial Transcript, May 11, 1994, 75; Trial Transcript, May 12, 1994, 21–23). When asked by Officer Caswell whether there existed in his mind any question that it was Petitioner who assisted him in perpetrating the assault on Shirley Martin, Schippers replied, "yeah, that's the only person I can think of, and I'm pretty sure that that was the person who was with me." (Preliminary Examination Transcript, August 18, 1992, 95; Trial Transcript, May 11, 1994, Dkt. # 17, 92–93; Trial Transcript, May 12, 1994, 46).[2]

As Schippers also indicated, prior to assaulting Martin in the early morning hours of August 30, 1986, he had "been drinking and smoking drugs and partying all night." (Preliminary Examination, August 18, 1992, 67; Trial Transcript, May 11, 1994, 59). Specifically, Schippers testified that he had drank "a little over a fifth" of rum and vodka, smoked "three or four joints," and snorted "one or two" lines of cocaine. (Preliminary Examination, August 18, 1992, 87; Trial Transcript, May 11, 1994, 79–81). He further reported having experienced blackouts and memory losses as a result of his drug and alcohol use. (Preliminary Examination, August 18, 1992, 98).

Schippers noted that he knew Martin previously and also knew where she lived, having in the past purchased drugs from her at her residence. (Preliminary Examination, August 18, 1992, 88–89, 102–03; Trial Transcript, May 11, 1994, 81–83). Schippers reported that it was his idea to go to Martin's apartment on the morning of August 30, 1986, and that he went there to "find drugs because [he] had purchased drugs before from Shirley Martin." (Trial Transcript, May 11, 1994, 83–84).

Petitioner was ultimately charged with the following: (1) first degree criminal sexual conduct, (2) two counts of armed robbery, and (3) breaking and entering. (Trial Transcript, May 11, 1994, 17–19). Following a bench trial before the Honorable John F. Foley, Petitioner was convicted on all four counts. (Trial Transcript, May 19, 1994, 3–8). Petitioner was sentenced to a term of 18–40 years imprisonment on the charge of first degree sexual assault, a term of 10–30 years imprisonment on each of the armed robbery charges, and a term of 4–15 years imprisonment on the charge of breaking and entering. (Sentencing Transcript, June 27, 1994, 20).

## ANALYSIS

### I. The Decision by the Trial Court to Grant Petitioner a New Trial

Petitioner asserts that the trial court acted properly in ordering that he be granted a new trial. To the extent that this claim implicates state law, such is beyond the power of this Court to review. See 28 U.S.C. § 2254(a) (the federal courts

---

2. The prosecution subsequently attempted to rehabilitate Schippers on this point. After Schippers made this statement, Officer Caswell allegedly asked him whether he was sure that it was Petitioner who was assisted him on the night in question, to which Schippers responded that he was sure that it was Petitioner. (Trial Transcript, May 12, 1994, 47–48). The prosecution also asked Schippers whether there "was any doubt" in his mind that it was Petitioner that assisted him in committing these crimes, to which Schippers testified that he was positive that it was Petitioner. (Preliminary Examination Transcript, August 18, 1992, 109; Trial Transcript, May 11, 1994, Dkt. # 17, 93). However, the Court finds it significant that Schippers' first identification was equivocal.

can only consider habeas claims alleging violations of the Constitution, laws, or treaties of the United States). To the extent that this claim raises issues properly cognizable in this Court, these are addressed individually below.

## II. Denial of the Effective Assistance of Counsel

Petitioner asserts that he was deprived of the right to the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. Petitioner was represented by two attorneys, at separate times, prior to and during trial. After he was charged, Petitioner retained the services of Richard Stroba. Because Petitioner was unable to afford his services, however, Stroba withdrew his representation on September 14, 1993. (Motion Transcript, September 14, 1993, 3–4).[3] After permitting Stroba to withdraw, the trial court appointed James Narregan to represent Petitioner. (Motion Transcript, September 14, 1993, 5–7; Trial Transcript, May 11, 1994, Dkt. # 18, 13–14). Petitioner's claim of ineffective assistance implicates the actions and inactions of Narregan only.

The Sixth Amendment to the United States Constitution provides for the right of the assistance of counsel. U.S. Const. amend. VI. The United States Supreme Court has long recognized, however, that it is the right to the *effective* assistance of counsel that is necessary to protect the fundamental right to a fair trial as secured by the Due Process Clause of the United States Constitution. *See Strickland v. Washington,* 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As the Supreme Court has indicated, the right to the effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Where there has not occurred "a true adversarial criminal trial," the "constitutional guarantee is violated." *Id.* at 656–57, 104 S.Ct. 2039.

The *Strickland* Court established the applicable standard for determining when an attorney's performance is constitutionally ineffective. First, counsel's performance must be shown to be so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 687, 104 S.Ct. 2052. It must be established that the attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. A claim of ineffective assistance of counsel is "an attack on the fundamental fairness of the proceedings whose result is challenged." *Lewis v. Alexander,* 11 F.3d 1349, 1354 (6th Cir.1993). The reviewing court must, therefore, "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

With respect to the second prong of the *Strickland* standard, counsel's performance must have been so deficient as to deny Petitioner of the right to a fair trial. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Kinnard v. United States,* 313 F.3d 933, 935 (6th Cir.2002). Petitioner must, in other words, demonstrate that he suffered prejudice as a result of his attorney's deficient performance. To establish the existence of such prejudice, Petitioner

---

**3.** The transcript reads "September 14, 1994," but as indicated by the court reporter's certificate attached to the transcript, the correct date is September 14, 1993.

must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Woodford v. Visciotti*, 537 U.S. 19, 123 S.Ct. 357, 359, 154 L.Ed.2d 279 (2002) (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

This standard *does not*, however, require Petitioner to show that it is "more likely than not" that the outcome would have been different. *See Woodford*, 123 S.Ct. at 359 (noting that the *Strickland* Court "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered") (citing *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052). Instead, Petitioner need only demonstrate that counsel's performance was so deficient and prejudicial as to undermine confidence in the proceeding's outcome.[4] *See Woodford*, 123 S.Ct. at 359 ("a reasonable probability is a probability sufficient to undermine confidence in the outcome") (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

### A. Failure to Investigate Alibi Defense

Petitioner first asserts that counsel was ineffective in that he failed to "contact and call alibi witnesses." With respect to this claim, it is important to note that the question is not whether Petitioner can establish the existence (or the possible existence) of an alibi. To call into question his attorney's performance, Petitioner must instead demonstrate that his attorney knew (or should have known) of the existence or possible existence of an alibi defense and nonetheless failed to investigate or pursue such a defense. Petitioner testified at trial regarding this issue. The relevant exchange is as follows:

Mr. Narregan: Now, so we can get this out of the way, you and I discussed

this matter with regard to your exact whereabouts on August 30th of 1986. Is that correct?

Petitioner: Could you repeat that?

Mr. Narregan: You and I talked about this beforehand with regard to your exact whereabouts on August 30th, 1986. Is that correct?

Petitioner: Yes.

Mr. Narregan: And in spite of conferences with yourself, your mom, your wife, et cetera, were you able to pinpoint exactly where you were on that date so that I could give appropriate notice?

Petitioner: No, sir.

Mr. Narregan: All right. Is that because it's eight years ago?

Petitioner: Yes, sir, eight years is a long time.

Mr. Narregan: But I would ask you, sir, you've heard the testimony and the allegations against you with regard to your participation here and, depending on whether you believe the victim, the victims in this case, you were the Black man standing behind him or, if you believe Eric Schippers in this case, you were the person that aided and abetted the person standing behind Mr. Osborn. Did you participate in this incident on August 30, 1986?

Petitioner: No, sir.

(Trial Transcript, May 18, 1994, 6–7).

Petitioner's testimony suggests that counsel discussed with him the matter of his "whereabouts" on the night in question and, furthermore, that Petitioner was unable to recall where he was on that particular night. Nonetheless, at sentencing, Petitioner asserted that he provided Mr. Stroba and Mr. Narregan with "a list of names," indicating that "these names were

---

**4.** Here, the trial judge expressed in no uncertain terms his complete lack of confidence in the outcome, granting Petitioner a new trial and calling his conviction "the greatest miscarriage of justice" he had witnessed in 27 years of practice and 12 years on the bench.

people who could have testified that I was not in Michigan at the time these crimes were committed." (Sentencing Transcript, June 27, 1994, 13–14). Petitioner further asserted that "[t]his information was never used and it was never even checked out." *Id.* at 14. When questioned by the trial judge regarding this matter, Petitioner stated that Mr. Narregan instructed him "not to mention that [he was] out of state," as "it may not be of any help." *Id.* at 18.

In support of his claim, Petitioner notes the precise wording of the question posed by Mr. Narregan.[5] As indicated above, counsel did not ask Petitioner where he was on August 30, 1986, but rather asked him whether he was able "to pinpoint exactly where [he was] on that date" so that counsel "could give appropriate notice." Petitioner asserts that this question "reflects a disturbing effort on behalf of defense counsel to insulate himself from criticism for not contacting alibi witnesses." (Dkt. # 41 at 3). While I also find suspect the precise wording of counsel's question, a closer examination of Petitioner's position reveals its logical inconsistency.

Petitioner asserts that Mr. Narregan met with him only twice prior to trial— "once immediately after being appointed and then immediately before trial." (Dkt. # 41 at 4). As Petitioner further asserts

> Instead of asking petitioner at trial whether he was in another state or with another person in August of 1986, trial counsel posed the question whether Petitioner gave the alibi names to counsel during the one pretrial conference with trial counsel. Because petitioner did not give the names to trial counsel at that

time, he answered truthfully that he did not provide the alibi "so that I could give appropriate notice." The question itself implies that, consistent with petitioner's claims, he did give his trial counsel the basis for an alibi defense, albeit according to defense counsel too late. (Dkt. # 41 at 4–5).

In other words, Petitioner asserts that until meeting with Mr. Narregan "immediately before trial," counsel was not informed of the existence of an alibi defense and, furthermore, that it was only counsel's ineffective representation that prevented him from learning of the existence of an alibi defense in time to properly notify the court and the prosecution.

Petitioner's argument is contradicted, however, by his statement at sentencing that he provided Mr. Stroba with a list of alibi witnesses, (Sentencing Transcript, June 27, 1994, 13–14), as well as his assertion that he *"sent"* Mr. Narregan a list identifying his alibi witnesses. (Dkt. # 41 at 4). Petitioner's trial testimony that he was unable to timely (i.e., in time to provide proper notice of an alibi defense) recall where he was on August 30, 1986, is, therefore, not entirely accurate.

The Michigan Court of Appeals denied Petitioner's claim of ineffective assistance, specifically concluding that Petitioner's "belated claim of an alibi" was "incredible" and that, therefore, counsel's performance in this regard was not deficient. *Leonard,* 224 Mich.App. 569 at 592, 569 N.W.2d 663. I also find it difficult to contemplate that Petitioner would testify as he did, if he had been able to recall that he was not in Michigan at all on August 30, 1986.[6]

---

**5.** Petitioner has also submitted affidavits from the "alibi witnesses."

**6.** I note that Petitioner sought in this Court an evidentiary hearing at which to more fully develop the factual basis of this particular claim. Aside from his various assertions, which I have considered, Petitioner's request

for an evidentiary hearing (with respect to this issue) focused exclusively on his assertion that he has a valid alibi defense. As previously noted, however, whether Petitioner was actually in another state on August 30, 1986, as he claims, is not relevant when examining the effectiveness of his attorney's representa-

I reluctantly conclude, therefore, that the decision by the Michigan Court of Appeals on this particular issue, while perhaps not salutary in light of Petitioner's counsel's abysmal performance, is neither contrary to nor involves an unreasonable application of Supreme Court authority. Accordingly, this claim raises no issue upon which habeas relief may be granted.

### B. Failure to Challenge the State's DNA Evidence

Petitioner also asserts that he received ineffective assistance in that counsel failed to obtain a DNA expert. I agree, but would further note that counsel's ineffective assistance in this regard is the result of more than this single omission. To the contrary, counsel's ineffective assistance is extensive and is evidenced by repeated unprofessional errors as detailed below. Counsel's ineffective representation is perhaps best characterized by my conclusion that he completely failed to subject the State's DNA evidence to any "meaningful adversarial testing."

Before analyzing counsel's performance, a general discussion of DNA, as well as the extraction procedure and analysis methods utilized in this matter is necessary. In this respect, I recognize that counsel's performance must be evaluated in terms of the circumstances he faced at the time of trial, rather than judged with the benefit of hindsight. This is especially important when evaluating counsel's actions or inactions with respect to matters regarding rapidly evolving scientific methods such as DNA. Accordingly, in the context of discussing and analyzing counsel's performance I have "confined my scientific knowl-

edge" to material contemporaneous with the various proceedings in this matter.

### 1. DNA and RFLP Analysis [7]

DNA is the material that determines the genetic characteristics of all living things. Except for identical twins, no two individuals have identical DNA and, furthermore, DNA does not vary within a particular individual. In human beings, every cell containing a nucleus also contains DNA, distributed across 46 sections of the cell's nucleus. These sections are known as chromosomes and are arranged in 23 pairs. Each chromosome contains thousands of genes.

Each DNA molecule is shaped liked a twisted ladder. The sides of the ladder are composed of phosphate and sugar molecules. The rungs of the ladder are composed of pairs of bonded molecules. Specifically, four separate chemical bases—Adenine (A), Cytosine (C), Guanine (G), and Thymine (T)—lie next to each other along the sides of the ladder. Each A always bonds with a T on the other side of the ladder. Each C always bonds with a G on the other side of the ladder. Therefore, the only possible base pairs on the ladder are A–T, T–A, C–G, and G–C. Each of these base pairs forms one rung of the ladder.

There exist approximately three billion base pairs in each DNA molecule. While no two humans share the exact same sequence of base pairs (identical twins excepted), all humans share many identical sequences of base pairs. It is estimated that approximately 99 percent of the base

tion. In this respect, Petitioner in no way stated that he would or could present evidence (other than his own) on the issue of counsel's performance regarding the existence of an alibi defense.

**7.** The general description of DNA and DNA analysis which follows is a synthesis of the descriptions articulated by the following courts. *People v. Adams,* 195 Mich.App. 267, 489 N.W.2d 192 (1992); *Springfield v. State,* 860 P.2d 435 (Wyo.1993); *United States v. Jakobetz,* 955 F.2d 786 (2d Cir.1992).

pairs which comprise each DNA molecule are identical from one person to the next. These identical sequences create those features which are uniquely human.

On the other hand, certain sections of each DNA molecule differ from individual to individual, race to race, and ethnic group to ethnic group. These areas of variation are called polymorphic sites. At some polymorphic sites short sequences of base pairs repeat in tandem, over and over again. These repeating sequences are known as alleles. Because the number of times the core sequence of base pairs repeats may vary among individuals, the length of a given allele, measured in numbers of base pairs, may also vary.

The goal of forensic DNA identification is to isolate and analyze certain alleles. Each DNA molecule contains approximately three million alleles. While all of these alleles are polymorphic, some are much more polymorphic than others. Because it is impractical to examine all the polymorphic regions of the DNA molecule, DNA profiling attempts to isolate and analyze several highly polymorphic segments of DNA.

The type of DNA analysis that was performed in this matter is known as Restriction Fragment Length Polymorphisms (RFLP). While the specific protocols and procedures utilized by various laboratories differs, in general the RFLP process consists of seven separate steps: (1) DNA extraction, (2) restriction, (3) gel electrophoresis, (4) Southern transfer and denaturing, (5) hybridization, (6) autoradiography, and (7) interpretation.

a. DNA Extraction

The biological material containing the DNA must first be separated from the material in which it is located. The biological material is then treated with organic solvents which release the DNA. The re-

sulting DNA is then purified with various enzymes.

b. Restriction

The DNA is then mixed with restriction enzymes which chemically "cut" the DNA molecule at specifically targeted base pair sites. This process produces restriction fragment length polymorphisms (RFLPs). These RFLPs (or DNA fragments) can very in length from a few base pairs to several thousand.

Degraded DNA samples can complicate this procedure. If a DNA fragment is contaminated, this may cause the restriction enzymes to cut the DNA in the wrong places, causing fragments to be different lengths than would ordinarily be the case.

c. Gel Electrophoresis

In this step the DNA fragments are sorted by length using a gel into which lanes are created. Cut DNA fragments from the victim, the suspect, and crime scene are loaded into separate lanes of the gel. In addition to the sample fragments, other DNA fragments of known length are loaded in separate lanes to facilitate measurement of the sample DNA fragments.

The gel is then electrically charged, causing the negatively charged DNA to migrate toward the positive end of the gel. The smaller DNA fragments will travel further towards the positive end of the gel than the larger fragments, resulting in an array of DNA fragments sorted according to size.

d. Southern Transfer and Denaturing

After separating the DNA fragments by size, the dual strands of the DNA double helix are denatured with an alkali solution which separates the strands of the DNA helix like "opening a zipper or splitting the rungs of a ladder." Because the gel is difficult to work with, the single DNA

strands are transferred from the gel to a nylon membrane. This causes the RFLPs to become permanently fixed in their respective positions on the membrane. This is often referred to as a "blot."

### e. Hybridization

This is the technique by which the highly polymorphic alleles contained within the fragments, those most useful in forensic DNA typing, are located. This is accomplished by dipping the nylon membrane in a solution of various "genetic probes"—single-stranded DNA fragments of known length and sequence. These probes will bond with only those RFLPs which contain the same core sequence. These genetic probes are "tagged" with a radioactive marker used to determine the probe's position on the blot after it hybridizes with a polymorphic segment. The residual probes that did not locate complimentary DNA are then washed off the nylon membrane.

### f. Autoradiography

This is the process by which the position of the probes, and their complimentary and now linked polymorphic fragments, is recorded. This is accomplished by placing the nylon membrane on an x-ray film which is then exposed by the energy of the radioactively tagged probes. This process results in a pattern of bands called an autoradiograph or an autorad. Each band represents a different polymorphic allele and its position indicates the length of the fragment in which that allele occurs. Because the length of alleles may differ among individuals, the position of the bands on the autorad will tend to differ from person to person.

### g. Interpretation

In this step the location of the alleles on the autorad are examined to determine whether or not two separate DNA samples (e.g., a known sample taken from the defendant and a sample recovered from the crime scene) originate from the same person. This comparison can be accomplished through either a visual inspection or with a machine that measures the bands through a process of computer imaging, or both. A match will be declared if the bands fall within a certain distance of each other.

Once a match is declared, its statistical significance must be determined. This requires knowledge of the frequency with which each individual allele occurs in a particular population. One method by which this is accomplished is referred to as "fixed bin analysis." A bin is an arbitrarily defined range of base pairs. Any allele with a base-pair length within that range is classified as belonging to that bin. Target populations are then sampled to establish a data base of allele frequencies.

Interpretation of autorads is not perfect, however, Problems surrounding the interpretation of autorads include the acceptable measure of deviation in band match that should be allowed before declaring a match, the level of subjective evaluation that inheres in this interpretation, and the level of skill and expertise of the analyst who performs the interpretation.

### 2. Counsel's Deficiencies

To properly assess and analyze counsel's various deficiencies, a brief chronology of the relevant facts is in order. These facts will then be explored in more detail as appropriate to illustrate my analysis and support my conclusions.

### a. Background

Petitioner was initially represented in this matter by Richard Stroba, whom Petitioner retained privately. In January 1993, Stroba retained the services of DNA expert, Benjamin Grunbaum, Ph.D. (Grunbaum Affidavit at 3). Dr. Grunbaum earned a Ph.D. in biochemistry from the

University of California, as well as a master's degree in criminalistics. *Id.* at 2. He has been employed since approximately 1979 as a consultant in analytical biochemistry, having worked for both prosecuting attorneys and defense attorneys. Dr. Grunbaum has also testified as an expert regarding such matters. *Id.*

Stroba sought Dr. Grunbaum's assistance in (a) evaluating the DNA evidence, and (b) preparing for a suppression hearing and trial. *Id.* at 3. In January 1993, Stroba provided Dr. Grunbaum with materials he had received from the Michigan State Police (MSP) crime laboratory. In May 1993, Stroba provided to Dr. Grunbaum additional discovery material. Dr. Grunbaum informed Stroba, however, that "discovery was incomplete," as "[t]he defense did not have several documents that it had requested" and "had not received all of the autoradiographs generated in this case." I infer that Petitioner (and thus Dr. Grunbaum) had been provided by the prosecution with only those autorads that supported the State's theory.

Mr. Stroba subsequently withdrew his representation because Petitioner was unable to afford his services. (Hearing Transcript, March 8, 1994, 172–73). Before withdrawing, however, Stroba moved in the trial court to suppress the State's DNA evidence and a suppression hearing was scheduled for March 8, 1994. (Hearing Transcript, March 8, 1994, 175). James Narregan was appointed to represent Petitioner in September 1993. (Motion Transcript, September 14, 1993, 3–7; Trial Transcript, May 11, 1994, Dkt. # 18, 13–14).

Even though he was aware that Stroba had moved to suppress the DNA evidence and that Dr. Grunbaum had already been consulted regarding this matter, Narregan did not contact Dr. Grunbaum until March 4, 1994, four days before the suppression hearing. Moreover, Narregan had neither contacted nor consulted with any other expert since being appointed to represent Petitioner six months earlier.

During his conversation with Narregan, Dr. Grunbaum realized that Narregan was "unfamiliar with" the issues which would be addressed during the suppression hearing. (Grunbaum Affidavit at 3). Furthermore, Narregan was "unfamiliar with the problems [Dr. Grunbaum] had identified with the DNA testing and communicated to Mr. Stroba." Dr. Grunbaum was unable to attend the suppression hearing, but he "urged Mr. Narregan to request a continuance so that he could prepare himself for effective cross examination of the prosecution experts." *Id.* In this respect, Dr. Grunbaum offered his services to Narregan, an offer which Narregan declined. *Id.* at 3, 11. Furthermore, Narregan did not ask Dr. Grunbaum to return the discovery materials he had previously been provided, nor did he ask Dr. Grunbaum if he was able to provide him with the names of any other experts with whom he may be able to consult. *Id.* at 3–4, 11.

At the March 8, 1994, DNA suppression hearing, the State offered testimony from three individuals regarding the DNA method and procedures utilized in this matter. Narregan presented neither witnesses nor exhibits at the hearing. Furthermore, while Narregan cross-examined the three witnesses who testified at the suppression hearing, as discussed in more detail below, his attempts to do so were ineffective and demonstrated his alarming lack of preparation and substantive knowledge. Narregan's failures in this regard were most pronounced with respect to the technician who actually performed the DNA extraction and analysis in this matter.

At the conclusion of the suppression hearing, Narregan moved the Court to authorize funds to pay for Dr. Grunbaum's

services. (Hearing Transcript, March 8, 1994, 173–74). Because Stroba and Dr. Grunbaum had been privately retained, this appears to be the first instance in which this matter was brought to the court's attention. *Id.* at 173–75. As the Michigan Court of Appeals noted, Narregan never even filed "a formal motion for an expert." *Leonard,* 224 Mich.App. 569 at 586, 569 N.W.2d 663. The trial court authorized Petitioner to retain the services of a DNA expert, provided any such expert not charge more than $125 per hour, the "top rate" authorized by the relevant court rules. (Hearing Transcript, March 8, 1994, 175). In this respect, the trial judge related a conversation that he had with Dr. Grunbaum regarding his services. As the judge observed, Dr. Grunbaum charged $150 per hour for his services, an amount beyond which he could authorize. The trial judge nonetheless implored Narregan to "use [his] best efforts to obtain an expert." *Id.*

The suppression motion was continued to May 11, 1994. (Trial Transcript, May 11, 1994, Dkt. # 18, 3). The trial judge, however, made clear to Narregan that because the suppression motion had originally been filed *15 months* previously, and the suppression hearing adjourned "many times, at the request of defense counsel," this matter "really must proceed." (Hearing Transcript, March 8, 1994, 175–76) (emphasis supplied).

Narregan never asked Dr. Grunbaum whether it was possible to restructure his fees so that his services could be retained consistent with the court's order. More significantly, Narregan never requested that the court reconsider its decision regarding the amount of money it would authorize to employ a DNA expert. Narregan's failure in this regard is not merely academic. As the trial judge later indicated, "[w]e have a written policy about the amount that is allowed for experts at $125 per hour, but we can use discretion in particular cases to exceed that, and I was prepared to do that here." (Trial Transcript, May 11, 1994, Dkt. # 18, 10). While the trial judge later informed Narregan that he was prepared to grant to him the authority to employ an expert at the rate of $150 per hour, the judge also indicated that he was concerned about the number of hours that Dr. Grunbaum would apparently bill for his services. *Id.* The judge's concerns were premised upon an apparent misunderstanding regarding the manner in which Dr. Grunbaum charged for his services. (Trial Transcript, May 11, 1994, Dkt. # 18, 10; Affidavit of Dr. Benjamin Grunbaum at 3). With any diligence, Narregan could have easily clarified the judge's misunderstanding, but failed to either speak with Dr. Grunbaum or pursue the matter further in the trial court.

On May 11, 1994, the trial court again took up the matter of Petitioner's motion to suppress the DNA evidence. (Trial Transcript, May 11, 1994, Dkt. # 18, 3–4). At the outset, Narregan indicated that he still had not retained, nor even consulted with a DNA expert. *Id.* at 4–6. With respect to the efforts he had undertaken to secure the necessary services of a DNA expert, Narregan stated that the only action he had taken in the previous two months was to ask the prosecuting attorney for the names of experts who "might be useful." *Id.* at 5. The prosecuting attorney provided Narregan with the names of two individuals. To Narregan's surprise, however, these individuals were unable to assist him, because "they primarily were prosecution witnesses." *Id.* Narregan also indicated that it was not until he communicated with these individuals that he realized that "there are two types of testimonial experts ... [o]ne testifying for DNA, forensic DNA analysts and, second, those challenging the admissibility thereof." *Id.* at 5–6.

Narregan then asked the court to grant the motion to suppress based simply upon his "cross-examination of the witnesses that testified at the hearing." *Id.* Furthermore, even though he realized that the issues presented by the suppression motion (i.e., admissibility of the DNA evidence) were distinct in certain respects from the issues relevant at trial (i.e., credibility of the evidence and the weight that it should be accorded), Narregan nonetheless indicated to the court that, assuming his motion to suppress was denied, he would "stipulate for purposes of trial that the testimony heretofore given [by the three experts testifying at the March 8, 1994 proceeding] . . . may be utilized in the case in chief in lieu of the prosecution bringing their four experts back to testify again." *Id.* at 6–7.

Finally, Narregan sought an adjournment to enable him to "gather evidence for the motion to suppress." *Id.* at 9–10. Not surprisingly, the trial judge denied Narregan's request to adjourn the proceedings, noting that the matter had been adjourned on several previous occasions at the request of both Stroba and Narregan. *Id.* at 11–14. The judge also denied Narregan's motion to suppress the DNA evidence, noting that such was admissible so long as "generally accepted laboratory procedures were followed." *Id.* at 14–17. Petitioner's trial immediately commenced. *Id.* at 17.

As indicated above, Narregan expressly declined to cross-examine at trial the three witnesses that testified at the suppression hearing. Narregan made this decision even though his efforts to that point to develop and present evidence challenging the admissibility or credibility of the State's DNA evidence were unprofessional, unsuccessful, and completely inadequate. This conclusion is evidenced by counsel's request for an adjournment to "gather evidence." More importantly, it is evidenced by the inadequacy of Narregan's cross-

examination of the State's DNA experts at the suppression hearing, as detailed below. Moreover, while the State questioned at trial one additional DNA expert, as also detailed below Narregan's attempt to cross-examine him was totally ineffectual.

b. Testimony and Cross–Examination of Dr. Julie Howenstine

At the March 8, 1994, DNA suppression hearing, the State offered testimony from three individuals regarding the DNA method and procedures utilized in this matter. First to testify was Dr. Julie Howenstine. (Hearing Transcript, March 8, 1994, 5). Her testimony was especially important, as she was the technician who actually performed the DNA extraction and analysis. *Id.* at 69.

Howenstine testified that she was originally trained as a veterinarian and presently worked for the Michigan State Police as a DNA analyst. *Id.* at 5–6. With respect to her training in the area of DNA analysis, Howenstine indicated that she had attended a "one month training period" with the Federal Bureau of Investigation and had also attended "numerous" seminars and workshops. *Id.* at 6–7.

As could be expected, Howenstine testified regarding the protocol and procedures which she utilized in extracting and analyzing the DNA in this matter. *Id.* at 10–11. She stated that the laboratory's protocol is contained in a written document, at which point Narregan interrupted because he did not have a copy of this material and requested that he be provided with a copy of it "at the *end* of this—at the end of this motion." *Id.* at 11.

As Dr. Grunbaum testified in his affidavit, he had reviewed the laboratory's protocol. Thus, Narregan could have obtained this information long before the suppression hearing. Given the importance of the laboratory's protocols and pro-

cedures in determining the admissibility of the DNA evidence, as well as the weight which should have been given to this evidence, Narregan's failure to review this material before the suppression hearing is inexcusable and incompetent.

While Narregan requested (during the hearing) that he be provided with a copy of the relevant protocols, he specifically stated that he did not need this material until *after* the suppression hearing was completed. Thus, while Narregan could have perhaps lessened the impact of his failure to prepare beforehand by at least having the protocols at his disposal during the hearing, he failed in this regard by stating that he did not need a copy of the protocols until after the suppression hearing was completed. In other words, Narregan observed Dr. Howenstine's direct examination and, furthermore, conducted a cross-examination of her without having reviewed the protocols and procedures which she utilized in this matter and about which she testified in detail. This failure is inexcusable and as discussed below was not insignificant.

In any event, the trial judge denied Petitioner's motion to suppress the DNA evidence. The judge expressly relied on *People v. Adams*, 195 Mich.App. 267, 489 N.W.2d 192 (1992), which as the judge noted was, at that time, the controlling case on the matter. (Trial Transcript, May 11, 1994, 14–17). The significance of the *Adams* decision was also well known to both Narregan and the prosecuting attorney, as evidenced by their comments. *Id.* at 7–8. A brief discussion of the *Adams* decision is relevant to understanding some of Narregan's subsequent shortcomings.

The DNA testing at issue in *Adams* was performed by Cellmark Diagnostics, who extracted and analyzed the DNA pursuant to the general RFLP method described above. *Adams*, 489 N.W.2d at 194–95. With respect to the DNA's admissibility,

the trial court in *Adams* held a hearing at which evidence was presented regarding the protocols and procedures utilized by Cellmark. *Id.* at 194–96. In affirming the trial court's decision to permit the introduction of the DNA evidence, the court of appeals concluded that:

Given the overall acceptance of the technique in other jurisdictions, we hold that trial courts may take judicial notice of the reliability of DNA identification testing. Nonetheless, before a trial court admits the test results into evidence, the prosecutor must establish in each particular case that generally accepted laboratory procedures were followed.

*Id.* at 197. In this respect, the court of appeals determined that the protocols and procedures employed by Cellmark satisfied the admissibility standard. *Id.*

Dr. Howenstine testified that the protocols and procedures that she employed were identical to those used by Cellmark and approved by the Michigan Court of Appeals in *Adams*, clearly implying that, therefore, the results of her extraction and analysis were admissible under then controlling Michigan law. (Hearing Transcript, March 8, 1994, 22). This assertion, however, was not accurate. This fact was not brought to light by Narregan, however. Because he had never reviewed the protocols used by Dr. Howenstine, he was simply unprepared to assess or challenge her testimony. Instead, it was not until *after* Narregan completed his cross-examination that Dr. Howenstine's misstatement came to light during a discussion between the judge and Dr. Howenstine.

The judge specifically asked Dr. Howenstine "do you use the same protocol as Cellmark?" (Hearing Transcript, March 8, 1994, 112). The doctor replied that the protocols that she employed were "similar" to those utilized by Cellmark and, furthermore, that the *differences* between the two

protocols was insignificant. *Id.* Narregan did not follow up this exchange with any questions of his own.

As Dr. Grunbaum indicates in his affidavit, Narregan "did not cross examine Dr. Howenstine on the basis and extent of her familiarity with the Cellmark protocol or her qualifications to evaluate it in comparison with the MSP protocol." (Grunbaum Affidavit at 5). This failure is significant considering Dr. Howenstine's testimony indicating that she was not qualified to formulate or evaluate the protocols and procedures that she utilized to extract and analyze DNA. (Hearing Transcript, March 8, 1994, 71). As Dr. Howenstine described it, the protocol is "like a cookie recipe" and her expertise extends only to performing the "step-by-step" procedures called for by the recipe, but does not extend to actually devising or analyzing the "cookie recipe" or protocol. *Id.* at 10–12.

As Dr. Grunbaum further asserts, "[c]ompetent cross examination [of Dr. Howenstine] by the defense would have established that Cellmark indeed uses different restriction enzymes and different probes, different population data, and different matching criteria." (Grunbaum Affidavit at 5). It is certainly conceivable (and perhaps even likely) that certain distinctions between protocols may have no impact upon the "quality" of the autorads produced during DNA extraction and, therefore, not detract from the DNA's admissibility or lessen the weight which it should be given. Two points, however, must be remembered.

First, as evidenced by her own testimony, Dr. Howenstine was not qualified to offer an opinion as to whether the protocol employed by the Michigan State Police laboratory was comparable to that approved of in *Adams,* or the significance which should be attributed to any distinction between the two. This is significant

as this issue directly impacted the question of the admissibility of the DNA.

More significantly, as Dr. Grunbaum indicates, the Cellmark protocols also differ from the protocols employed by Dr. Howenstine with respect to population data and matching criteria. As indicated above, these are items that do not call into question the "quality" of the product of the DNA extraction, but rather call into question the validity of the interpretation. This goes directly to the weight that the judge should have given to the DNA evidence.

In short, because of his total lack of preparation Narregan was unable to challenge Dr. Howenstine's assertion that the protocols and procedures she employed were indistinguishable from the protocols and procedures approved of by the *Adams* court. As detailed above, this was a significant failure on Narregan's part.

As noted above, after DNA is extracted it is sorted by use of a gel, into which DNA fragments from the victim, the suspect, and the crime scene will generally be placed. This enables all the relevant fragments to be extracted and sorted (and ultimately analyzed) under identical conditions. This was not done in the present case, a matter never addressed by Narregan.

As Dr. Howenstine testified, in November 1991 she extracted and analyzed DNA from Shirley Martin, Eric Schippers, and the crime scene (including material recovered during Martin's post-assault medical examination). (Hearing Transcript, March 8, 1994, 25). According to Dr. Howenstine, her analysis revealed that Martin had been assaulted by two individuals, one of whom was Eric Schippers. *Id.* at 26. With respect to the strength of the DNA samples obtained, the doctor characterized Schippers' DNA as "strong" but the DNA

correlating to his accomplice as "weak." *Id.*

The doctor testified that in August 1992 she received a known sample from Petitioner which she undertook to analyze. *Id.* at 27. However, when Dr. Howenstine extracted DNA from the sample known to have come from Petitioner, she did not simultaneously extract and analyze DNA from crime scene material containing the DNA of Eric Schipper's accomplice, which would have (as described above) produced a single gel in which the various DNA fragments were located. *Id.* at 27–30. She was unable to do this because she did not possess a large enough sample of sperm from Schipper's accomplice. *Id.* at 25–26. Instead, in August 1992, the doctor extracted DNA from only the known sample obtained from Petitioner, resulting in a separate gel/autorad from that created in November 1991. Dr. Howenstine then compared this result with the results of her November 1991 extraction and analysis. *Id.* at 27–37. As Dr. Howenstine indicated, she performed an "intragel comparison between the two" samples. *Id.* at 29–30.

While the doctor did concede that there exist certain inherent difficulties in performing such intragel comparisons, because this "concession" was offered on direct examination, she was able to minimize and trivialize any such difficulties. *Id.* at 37–39. Narregan completely failed to challenge Dr. Howenstine on this matter, nor did Narregan ever challenge (or seek clarification of) the doctor's previous observation that the crime scene DNA which correlated to Schipper's accomplice was "weak."

Dr. Grunbaum also recognized that there exist difficulties when performing intragel comparisons and he faulted Narregan for failing to challenge Dr. Howenstine regarding this matter. (Grunbaum Affidavit at 7–8). Additionally, Dr. Grunbaum observed that Narregan failed to question Dr. Howenstine (or any other witness for that matter) as to whether the procedures she utilized to perform the intragel comparison have been independently validated and approved, a prerequisite to its admissibility. (Grunbaum Affidavit at 7).

During his cross-examination of Dr. Howenstine, Narregan attempted to challenge the doctor's opinions and conclusions by making reference to various articles and statements, articulated by individuals whose opinions and conclusions were at odds in certain respects with those offered by Dr. Howenstine. (Hearing Transcript, March 8, 1994, 74–87). With proper preparation and/or assistance, this method may have proven useful. However, because Narregan was completely unprepared to question Dr. Howenstine, his attempt to impugn her credibility was woefully unsuccessful.

Whenever Dr. Howenstine was "challenged" by Narregan with a particular opinion or publication, the doctor was permitted to explain at length how the particular opinion or publication was incorrect. Because he was unprepared and did not understand the complex issues involved, Narregan was completely unable to challenge Dr. Howenstine's responses. The result was that rather than having her opinions and conclusions challenged, the doctor was able to actually testify at length (without challenge) in a manner which served only to bolster her credibility. As detailed in Dr. Grunbaum's affidavit, Narregan's failure in this regard was significant, as there apparently existed lively debate in the scientific community regarding RFLP analysis and the protocols and procedures utilized to perform such, the very matters about which Dr. Howenstine testified.

Much of Narregan's questioning of Dr. Howenstine can best be characterized as a

discovery expedition. *Id.* at 70, 90–98. Narregan repeatedly asked the doctor to provide him with copies of certain information about which she previously testified or that directly related to her work in this matter. Obviously, Narregan should have obtained such material prior to the suppression hearing and prepared himself to properly question the State's DNA experts.

Putting this failure aside, Narregan might still have been able to assist his client by obtaining the material he requested and properly preparing to challenge Dr. Howenstine (and the State's other experts) at trial, at which point the issue would be the weight which the court should give the DNA evidence, rather than its admissibility. By expressly waiving the right to question these witnesses at trial, however, especially Dr. Howenstine, Narregan utterly failed to represent his client.[8]

Finally, at the outset of his cross-examination of Dr. Howenstine, Narregan stated to the doctor that "I don't intend to cross-examine you in your area of expertise, with regard to your matches. I'll leave that for another day." (Hearing Transcript, March 8, 1994, 65). The clear implication of this statement is that he intended to question Dr. Howenstine primarily (if not exclusively) regarding the issue of the DNA's admissibility and would reserve for trial questions relating to the weight which should be accorded to the DNA evidence, should it be admitted.

This may have constituted an acceptable strategy, had Narregan actually undertaken to question the doctor at trial. As noted above, however, Narregan stated that should the judge deny the motion to suppress the DNA that he would "stipulate for purposes of trial that the testimony heretofore given [by the three experts testifying at the March 8, 1994 proceeding] ... may be utilized in the case in chief in lieu of the prosecution bringing their four experts back to testify again." (Trial Transcript, May 11, 1994, 6–7).

Considering that only a few moments *later*, Narregan requested an adjournment of the suppression hearing to provide him "more time to gather evidence for the motion to suppress," his agreement to waive cross-examination at trial of the State's DNA experts, especially Dr. Howenstine who actually performed the DNA extraction and analysis, is simply amazing. Narregan's "decision" in this regard was inexcusable and amounted to a total surrender as to any question regarding the persuasive value which the court should give to the DNA evidence.

### c. Narregan's Examination of Other DNA Experts

While Narregan's deficiencies are most pronounced with respect to his "examination" of Dr. Howenstine, counsel's lack of representation was apparent with respect to the State's other DNA experts as well.

#### (1) Dr. Paul Coussens

Dr. Paul Coussens also testified at the suppression hearing. (Hearing Transcript, March 8, 1994, 113). Dr. Coussens was, at that time, employed by Michigan State University in the departments of Animal Science and Microbiology. *Id.* at 113–15.

At the very outset of the doctor's direct examination, Narregan requested a copy of Dr. Coussens' resume, indicating that he had failed to even review beforehand the doctor's credentials. *Id.* at 113–14. Furthermore, when informed that there did not exist an extra copy for him, Narregan

---

8. In this regard, the weight accorded the DNA evidence seems particularly critical given the accomplice's initial tentative identification of Petitioner—the only other evidence implicating him.

simply requested that he be given a copy of the doctor's resume *after* the hearing. *Id.* at 114. Then, for some unexplained reason, Narregan immediately stipulated that Dr. Coussens was "a person competent to render an opinion in this matter." *Id.* Narregan made this concession without even knowing precisely the subject matter of Dr. Coussens' testimony and without any information from which to reasonably conclude that he was qualified to offer an opinion on any matter that might be addressed during the suppression hearing.

Narregan also revealed, at the outset of his cross-examination of Dr. Coussens, that he did not have copies of the notes that the doctor reviewed in formulating his opinion. *Id.* at 135–36. Again, Narregan simply requested that he be provided with copies of this material at some undefined date in the future. *Id.* at 136.

Dr. Coussens testified that he helped the Michigan State Police develop its RFLP procedures and protocols. *Id.* at 116. The doctor also indicated that he had participated in evaluations of these procedures and protocols. *Id.* When asked his opinion regarding the quality of the Michigan State Police laboratory, Dr. Coussens spoke in only positive terms, characterizing the lab as proficient and state-of-the-art. *Id.* at 117. The doctor also testified regarding his interpretation of the DNA testing which Dr. Howenstine performed, agreeing with Dr. Howenstine's conclusion that the testing indicated that Petitioner had sexually assaulted Shirley Martin. *Id.* at 118–35.

Narregan never challenged Dr. Coussens with respect to whether he was a neutral and unbiased witness. Considering that the doctor helped develop the protocols and procedures used by Dr. Howenstine, as well as the fact that Dr. Coussens participated in evaluations of the laboratory's protocols and procedures, Narregan's failure in this regard is striking.

Narregan's cross-examination of Dr. Coussens was similar to his cross-examination of Dr. Howenstine, in that it consisted almost entirely of Narregan "challenging" Dr. Coussens with various material, in response to which the doctor simply minimized and trivialized any opinions expressed therein which did not coincide with his own. *Id.* at 136–41.

The best illustration of the utter ineffectiveness of Narregan's performance in this regard comes straight from Narregan's own mouth. After Dr. Coussens easily fended off Naregan's attempts to "challenge" his opinions and conclusions, Narregan stated that he was "not in a position to debate the merits, other than the fact that based on your statements here that you're concurring with this that—that reasonable scientific minds may differ as to the ultimate opinion." *Id.* at 141. Such a statement can hardly have been expected to advance Petitioner's cause. Rather it seems to have indirectly bolstered Dr. Coussens' credibility.

Finally, at the conclusion of Narregan's cross-examination, Dr. Coussens testified that with regard to Dr. Howenstine's analysis, the relevant question was not whether the DNA sample obtained from the crime scene matched the sample known to have been obtained from Petitioner. *Id.* at 141–43. Instead, the doctor indicated that the more relevant question related to the statistical relevance of such a match. *Id.* In this respect, Dr. Coussens stated that, in his opinion, it was "very unlikely that a random individual within this population would have this exact pattern, if tested with the same three probes." *Id.* at 142–43.

While Narregan was able to get Dr. Coussens to concede that it was "possible" for a random person to display this exact

pattern, Narregan did not question Dr. Coussens further regarding his statement that the statistical relevance of a DNA match was the ultimate question. The trial judge did, however, permitting the doctor to elaborate about and attempt to explain the statistical analysis employed by the Michigan State Police laboratory. *Id.* at 143–49. Aside from the fact that the judge was required to question Dr. Coussens because of Narregan's ineptitude, the judge's questioning elicited several items about which Narregan should have further questioned or otherwise challenged the doctor. For example, Dr. Coussens indicated that the database utilized by the Michigan State Police laboratory

> was set up so it—it would match or be able to be used in conjunction with other databases, such as the F.B.I. database, that's because they use the same probes, in many cases, and they use the same restriction enzyme to cut the DNA with. Because if they use a different enzyme to cut the DNA than HAE–III you'd have a different pattern altogether.

*Id.* at 146.

Considering Dr. Howenstine's testimony that the protocol and procedures she used were not identical to those employed by the F.B.I., *id.* at 12–13, and Dr. Grunbaum's statement that the MSP laboratory protocols and procedures "differed not only from the Cellmark protocol, but also from the FBI protocol," (Grunbaum Affidavit at 5), Narregan should have explored the basis for this particular statement. During his discussion with the judge, Dr. Coussens was, in effect, validating the statistical methods utilized in this case. Given the statement, quoted above, however, it appears that Dr. Coussens' opinions in this regard, and the assumptions on which they rested, were subject to challenge. This could very well have impacted the DNA's admissibility, but more importantly perhaps, it could have significantly undermined the weight that the judge should have given the DNA evidence.

### (2) Charles Barna

Charles Barna also testified at the March 8, 1994 suppression hearing. (Hearing Transcript, March 8, 1994, 150). Barna indicated that he was the supervisor of the Michigan State Police DNA laboratory. *Id.* at 151. He also testified regarding his involvement in the creation of the Michigan State Police DNA laboratory. *Id.* at 150–56.

Barna was then questioned by the prosecuting attorney as to the statistical database and statistical methods which his laboratory employs, in response to which Barna testified at length regarding various theories and statistical methods. *Id.* at 156–63. Barna later acknowledged, however, that he was "certainly not, in any way, an expert in population statistics." *Id.* at 169.

Had Narregan properly prepared for the suppression hearing (e.g., obtained beforehand an indication of each witness' qualifications) and conducted a voir dire of Barna, Narregan could have challenged whether Barna should have been permitted to testify as an expert regarding a subject about which he subsequently acknowledged he was not an expert. Narregan failed to do so, however, leaving unchallenged this testimony. Considering Dr. Grunbaum's various criticisms regarding the protocol and procedures utilized in this matter, as well as the statistical analysis employed, Narregan's oversight in this regard was not insubstantial.

### (3) Dr. Patrick Conneally

Dr. Conneally was the one DNA expert who actually testified at trial. (Trial Transcript, May 17, 1994, 9). Dr. Conneally indicated that earned a Ph.D. in the field of human genetics and human population.

*Id.* at 9–10. The doctor indicated that he was "familiar with the DNA technology that is used at the Michigan State Police referred to as RFLP," specifically noting that he "has read, for example, thousands of autorads" and uses RFLP analysis "for other purposes ... other than forensic." *Id.* at 14, 16. Dr. Conneally then proceeded to testify at great length regarding the presumed accuracy of Dr. Howenstine's analysis and conclusions. *Id.* at 16–64.

Narregan's cross-examination of Dr. Conneally was both brief and ineffectual. At the outset of his cross-examination, Narregan made the following comment:

> There are two gentlemen that I have the utmost respect for, both of whom are deceased, but both of whom served me well in terms of giving advice especially when it comes to expert witnesses, such as yourself.
>
> First is Doctor Irving Younger from Harvard University who said never cross-examine an expert in his own area. And that has served me well and, if it isn't dogs, horses or bass fishing, I keep my mouth shut.
>
> My father is the other individual who told me, Jim, you know, this will serve you well: It is better to remain quiet than open your mouth and remove all doubt whatsoever.
>
> So taking the vein from both my father and from Professor Younger, I will proceed to ask you a couple of questions.

*Id.* at 64–65.

Narregan later stated that "[m]y undergraduate degree is in chemistry and my minor in biophysics and the only thing that assists me in is being able to read some-

what for entertainment rather than for content the NRC Report that you alluded to." *Id.* at 66. Finally, with respect to his knowledge of genetics, Narregan stated that "in genetics, closest thing we came to was a Puneit Square[9] ... [b]eyond that, I know nothing." *Id.* at 66–67.

The cross-examination which followed failed to advance Petitioner's cause. This should come as no surprise, considering Narregan's prefatory remarks that (a) he did not believe in cross-examining experts, (b) he should remain silent and let people think he is ignorant rather than open his mouth and remove all doubt, and (c) he possessed next to no substantive knowledge or understanding of the subjects about which Dr. Cousseans testified.

As Dr. Grunbaum indicates in his affidavit, however, had he been consulted he could have greatly assisted Narregan in challenging the doctor's credibility and the reliability of his opinions and conclusions. Specifically, Dr. Grunbaum detailed two instances where, in different cases, he directly assisted in undermining on cross-examination Dr. Conneally's credibility. (Grunbaum Affidavit at 9–10). Petitioner included copies of the relevant portions of these transcripts in his various post-conviction state court pleadings.

Finally, I note that Dr. Grunbaum has identified in his affidavit additional areas in which his assistance (or that provided by any competent DNA expert) could have greatly assisted Narregan in his defense of Petitioner. Petitioner's post-conviction state court pleadings also detail the extent

---

9. A Punnett Square is a method by which to determine possible gene combination passed from parent to offspring. *See* Using a Punnett Square, *available at* http://nbcc-correspondence.t elecampus.com/intera/ibio122/punnett/punnett.htm (last visited on January 23, 2003); *see also,* Baby Steps Through the Pun-nett Square, *available at* http://www.borg.com/ lubehawk/psquare.htm (last visited January 23, 2003); Deborah L. McLochlin, Whose Genetic Information is it Anyway?, 19 J. Marshall J. Computer & Info. L. 609, 628 fn.116 (2001).

to which Narregan failed to provide effective assistance of counsel.

### d. Narregan was not Qualified to Challenge, without Expert Assistance, the State's DNA Experts

In denying Petitioner's claim of ineffective assistance of counsel, the Michigan Court of Appeals stated that "the record does not reflect that defense counsel's performance was deficient or that defendant was prejudiced by defense counsel's performance." *Leonard,* 569 N.W.2d at 671. In this respect, the court found significant the fact that Narregan's undergraduate degree was in chemistry and, furthermore, that Narregan "exhibited an understanding of the scientific evidence, and effectively and comprehensively cross-examined the prosecution's experts." *Id.* at 671–72.

First, the fact that Narregan studied chemistry as an undergraduate approximately 35 years ago, says nothing about his knowledge or ability in this area. Narregan himself recognized this. In this respect, I note that Narregan's Michigan State Bar License Number (a.k.a. his P–Number) is 23511, which indicates that Narregan earned his Juris Doctorate degree in approximately 1970, and his undergraduate degree in approximately 1967. This is long before the advent of forensic DNA testing. Thus, the conclusion that Narregan was qualified to adequately challenge experienced DNA experts with advanced degrees simply because he earned an undergraduate degree in chemistry 35 years ago is just plain silly and reflects poorly upon the Michigan Court of Appeals.

As for that court's conclusion that Narregan "exhibited an understanding of the scientific evidence, and effectively and comprehensively cross-examined the prosecution's experts," I can only wonder whether I have been presented with a different set of transcripts than those presented to the Michigan Court of Appeals.

As detailed above, as well as in Dr. Grunbaum's affidavit and Petitioner's postconviction state court pleadings, Narregan was unprepared and failed to challenge the State's experts on some of the most rudimentary aspects relating to both the admissibility of the DNA and the weight which should have been given to that evidence. Furthermore, Narregan himself stated that "[m]y undergraduate degree is in chemistry and my minor in biophysics and the only thing that that assists me in is *being able to read somewhat for entertainment rather than for content."* (Trial Transcript, May 17, 1994, 66). Moreover, when "questioning" Dr. Coussens, Narregan stated that he was "not in the position to debate the merits [of Dr. Coussens' opinions], other than the fact that based on your statements here that you're concurring with this that—that reasonable scientific minds may differ as to the ultimate opinion." (Hearing Transcript, March 8, 1994, 141).

In support of its conclusion that Narregan possessed "a detailed understanding of the concepts involved in DNA testing," the court of appeals observed that "as a result of defense counsel's questions on cross-examination, Dr. Conneally admitted that, while no two people have the same fingerprint, it is possible for two people to have the same DNA print." *Id.* at 671. This statement is misleading, however, and fails to support the conclusion reached by the court of appeals. The relevant exchange is as follows:

> Narregan: The—just for the record, are you at all familiar with fingerprint evidence?
>
> Dr. Conneally: Only vaguely.
>
> Narregan: Is it your understanding that no two people have the same fingerprint?

Dr. Conneally: That certainly is true, even identical twins have different fingerprints, yes.

Narregan: And just for the record, at least based on our testimony we have today and the research done so far, it's possible that two people may have the same DNA print, is it not?

Dr. Conneally: Yeah, for one probe certainly. For two probes, possibly. For three probes, very unlikely. And as you go and use more and more, because no two people have the same DNA overall.

(Trial Transcript, May 17, 1994, 75–76).

The court of appeals is correct that Dr. Conneally acknowledged that it is possible for two people to have the same DNA print. But as the doctor clarified, such was the case *only with respect to one probe of the DNA analysis.* In other words, this statement represents nothing more than the observation that it is possible for minuscule discreet portions (i.e., alleles or fragments of the DNA) of two individual's DNA to "match" (i.e., have the same DNA print) with respect to a single probe of the DNA analysis. As the court of appeals failed to recognize, however, Dr. Conneally further stated that it was "very unlikely" for two people to have the "same DNA print" with respect to three probes (which Dr. Howenstine indicated was the case as to Petitioner).

Thus, while Dr. Conneally did state that it is possible for two people to have the same DNA print, the court of appeals in a very misleading manner interpreted this statement out of context. Contrary to the conclusion reached by the court of appeals this exchange did not help Petitioner's case and likewise fails to establish that Narregan possessed a "detailed understanding of the concepts involved in DNA testing." In fact, this exchange, like much of Narregan's efforts in this matter, actu-ally served to bolster the State's case against Petitioner.

### e. Counsel's Performance was Objectively Unprofessional and Constitutionally Deficient

The Sixth Amendment to the United States Constitution guarantees to every criminal defendant, the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Cronic,* 466 U.S. at 656, 104 S.Ct. 2039. As detailed above, Petitioner was utterly deprived of this right through the unprofessional and deficient performance of his attorney. Narregan's deficiencies in this matter are numerous and cannot be considered reasonable trial strategy. Instead, Narregan's strategy was to simply capitulate at the earliest opportunity.

By way of brief summation, by the time Narregan was appointed to represent Petitioner, Dr. Grunbaum had already been consulted and had already expressed to previous counsel the various deficiencies that, in his opinion, existed with respect to the admissibility and reliability of the DNA evidence utilized in this matter. Narregan was aware of this fact, but failed to contact Dr. Grunbaum (or any other expert) until almost six months later, when he contacted Dr. Grunbaum four days before the suppression hearing. As Dr. Grunbaum indicated, it was clear from this conversation that Narregan was woefully unprepared to challenge the State's DNA evidence.

After learning that Dr. Grunbaum was unable to attend the suppression hearing, Narregan made no attempt to secure the services or advice of any other expert prior to the suppression hearing, even though as Dr. Grunbaum indicated he would have provided Narregan with several names if asked. After the initial proceedings regarding suppression of the DNA, the only

action Narregan undertook to secure the necessary assistance of a DNA expert was to contact two individuals whom the *prosecuting attorney* suggested that Narregan contact. Ultimately, Narregan never contacted, consulted with, or retained the services of any DNA expert.

While reasonable strategic choices made by counsel are "virtually unchallengeable," where counsel "fails to investigate and interview promising witnesses, and therefore has no reason to believe they would not be valuable in securing defendant's release, counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir.1992) (citations omitted); *see also, O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir.1994) ("failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted"); *Miller v. Anderson,* 255 F.3d 455, 457–59 (7th Cir.2001) (*vacated by* 268 F.3d 485) (where defendant claimed not to have been at the scene of the crime, counsel's failure to consult with a DNA expert, to explore whether through DNA evidence defendant could prove his theory, constituted ineffective assistance); *Demarest v. Price,* 905 F.Supp. 1432, 1447–50 (D.Colo.1995) (counsel's "failure to investigate the State's case against [the defendant] or consider various defense theories rendered his representation deficient within the meaning of *Strickland.*").

This notion certainly applies to Dr. Grunbaum in particular, but also to DNA experts in general. Recall that the only other evidence against Petitioner was the alleged accomplice's equivocal identification given as the result of a plea bargain. Considering the knowledge available at the time he assumed responsibility for Petitioner's defense, Narregan had an absolute obligation to at the very least consult with an DNA expert. His failure to do so cannot be considered a reasonable strategic decision, but was instead the result of negligent (or nonexistent) representation.

Narregan's ineffective assistance was compounded and further demonstrated by his complete inability to challenge, meaningfully or otherwise, the DNA evidence. In this respect, it cannot be overlooked that Narregan completely waived his right to cross-examine at trial three of the State's DNA experts, most notably Dr. Howenstine. As detailed above, this decision cannot be considered reasonable strategy.

In short, by any measure, Narregan's performance in this matter was objectively unreasonable, falling below even the lowest standards of professional competence. The only remaining question, therefore, is whether Petitioner can demonstrate that he suffered prejudice as a result of Narregan's ineffective representation.

As discussed above, to establish that he suffered constitutionally significant prejudice, Petitioner must demonstrate that counsel's performance was so deficient and prejudicial as to undermine confidence in the proceeding's outcome. *See Woodford,* 123 S.Ct. at 359 ("a reasonable probability is a probability sufficient to undermine confidence in the outcome") (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052).

The only evidence which the State had against Petitioner was the testimony of Eric Schippers and the results of Dr. Howenstine's DNA testing. With respect to Schippers, it must be remembered that by his own admission he did whatever was necessary to satisfy the prosecuting attorney and save himself from spending the rest of his life in prison. His testimony is not particularly believable, especially considering his statement to the police, when asked if Petitioner was his accomplice, that "yeah, that's the only person I can think of, and I'm pretty sure that that was the

person who was with me." The only other evidence which the State produced against Petitioner was the results of Dr. Howenstine's DNA testing, which Narregan failed to challenge. There was no other evidence against Petitioner. None of the victims could identify Petitioner as Schippers' accomplice, and there was no other physical (or even circumstantial) evidence placing Petitioner at the scene of the crime.

The evidence and arguments detailed above, as well as the additional points articulated in Dr. Grunbaum's affidavit and Petitioner's post-conviction state court pleadings, in the undersigned's opinion, demonstrate beyond a doubt that Petitioner was deprived of a fair trial in this matter. After realizing the extent to which Narregan's incompetence extended, the trial judge, who acted as the trier of fact in this matter, clearly articulated his strongly-held conviction that he had lost *all* confidence in the fairness of Petitioner's trial and the result thereof. Considering the nature of the evidence against Petitioner (or more precisely the lack thereof) this is the only conclusion which a reasonable person can reach.

Accordingly, for the reasons detailed above, I conclude that the decision by the Michigan Court of Appeals that Petitioner was provided effective assistance of counsel was contrary to, and involved an unreasonable application of, clearly established federal law. Petitioner is, therefore, entitled to relief in this matter.

## III. Unreliability of the DNA Evidence

Petitioner claims that because the DNA evidence introduced against him was unreliable, its admission violated his constitutional rights.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Clemmons*

*v. Sowders,* 34 F.3d 352, 357 (6th Cir.1994) (citations omitted); *Clark v. O'Dea,* 257 F.3d 498, 503 (6th Cir.2001). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons,* 34 F.3d at 357 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Id.*

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (citations omitted). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "errors of state law" which render a trial fundamentally unfair violate the constitutional guarantee of due process and, therefore, can serve as the basis for habeas relief. *See Norris v. Schotten,* 146 F.3d 314, 328–29 (6th Cir.1998) (citing *Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475). Fundamental fairness does not, however, "require a perfect trial." *Clemmons,* 34 F.3d at 358.

As detailed above, Petitioner has established that the DNA evidence introduced against him was not beyond challenge, as even the Michigan Court of Appeals recognized. *Leonard,* 224 Mich.App. at 587, 569 N.W.2d 663 (recognizing that the DNA evidence was "certainly challengeable"). However, that the evidence was deserving of far less weight than it was accorded does not call into question its admissibility under Michigan evidentiary law. *See, e.g., Reid v. Page,* 47 F.Supp.2d 1008, 1012–13 (C.D.Ill.1999) ("any challenge to [the] reliability [of the DNA evidence] went to its

weight, rather than its admissibility"); *United States v. Page,* 2000 WL 139471 at *8 (N.D.Ill. Jan. 28, 2000) (same).

The Michigan Court of Appeals concluded that the DNA evidence was admissible under Michigan law. *Leonard,* 224 Mich. App. at 590–91, 569 N.W.2d 663. While Petitioner, with the assistance of competent counsel, may have been able to successfully challenge the admissibility of the DNA evidence, and may yet be able to do so if awarded a new trial, on the record presently before me I cannot conclude that the decision of the Michigan Court of Appeals was improper as regards the admissibility of the DNA evidence introduced against Petitioner. In short, while Petitioner certainly suffered unfair and adverse prejudice during his trial, such was the result of incompetent representation, not improper evidentiary rulings by the trial court. Thus, I conclude that this claim presents no issue upon which habeas relief may be granted.

## IV. Denial of a DNA Expert

Relying upon *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Petitioner asserts that the trial court erroneously denied his request to appoint for him an expert on DNA analysis. Respondent argues that Petitioner was not entitled to have a DNA expert appointed in this matter, an assertion that troubles me greatly. The *only* evidence the State could muster against Petitioner was the inconsistent testimony of a credibility-challenged witness, Eric Schippers, and DNA evidence, the reliability of which is not beyond reproach. The assertion that in such circumstances an indigent defendant is not entitled to the services of a DNA expert, causes me to seriously question the State's commitment to ensuring that every criminal defendant is afforded a fair trial.

I need not determine whether Petitioner was entitled to the services of a DNA expert, however, to resolve this particular claim. In *Ake,* the Supreme Court determined that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Id.* at 77, 105 S.Ct. 1087. Accordingly, the Constitution requires that indigent defendants be provided "an adequate opportunity to present their claims fairly within the adversary system." *Id.*

As detailed above, the trial court ruled that it would provide funds, up to $125 per hour, to enable Petitioner to purchase the services of a DNA expert. The trial court also indicated that it would have been willing to provide additional funds, a matter which Narregan never even pursued. That Mr. Narregan failed to make use of the resources provided to him, while relevant to the effectiveness of his representation, is irrelevant as to this issue. The trial court provided Petitioner with "*access to the raw materials*" necessary to mount an effective defense. That is all *Ake* requires. I conclude, therefore, that this claim presents no issue upon which habeas relief may be granted.

## V. Waiver of the Right to Trial by Jury

Petitioner asserts that his "purported waiver of jury trial" was invalid because the "record does not establish that [he] voluntarily and intelligently waived this right."

The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. Because the right to trial by jury is fundamental to our system of jurisprudence, it has been extended to the states via the Fourteenth Amendment. *See Duncan v. Louisiana,* 391 U.S. 145,

150, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). While a defendant may certainly waive this right, any such waiver must be a voluntary, knowing, and intelligent act performed "with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *see also, Patton v. United States*, 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930) ("express and intelligent consent of the defendant" is required for a valid waiver of the right to trial by jury).

The record indicates that on May 10, 1994, Petitioner signed (in open court) a "waiver of trial by jury" form. (Dkt. # 34; Waiver of Jury Proceeding, May 10, 1994, 3–4). Petitioner does not dispute that he voluntarily signed this form. Thus, the question becomes whether Petitioner understood the nature of the right he was surrendering. *See Spytma v. Howes*, 313 F.3d 363, 371 (6th Cir.2002) (where petitioner did not dispute that his waiver was voluntary, the relevant question was whether there existed "sufficient indicia that petitioner understood the nature of his right to trial by jury").

Petitioner's argument focuses on the absence of affirmative evidence in the record establishing that his waiver was knowing and intelligent. While it may be preferable for judges to engage defendants in lengthy colloquies before accepting any waiver of the right to trial by jury, the Sixth Circuit has expressly determined that such is not necessary. *See United States v. Sammons*, 918 F.2d 592, 597 (6th Cir.1990); *Spytma*, 313 F.3d at 371. While the burden of establishing that his waiver was constitutionally insufficient lies with Petitioner, he offers no affirmative evidence in support thereof. Accordingly, I recommend that this claim presents no issue upon which relief may be granted.

## VI. Denial of Continuance

Petitioner asserts that the trial court improperly denied his request for continuance. As detailed above, at the outset of trial, Narregan requested a continuance to allow him "more time to gather evidence for the motion to suppress." (Trial Transcript, May 11, 1994, 9–10). Considering "the length of time the defendant has had to prepare for the DNA hearing," the trial court denied counsel's request and proceeded to trial. *Id.* at 10–14. Petitioner asserts that this decision denied him of a fair trial.

For a denial of a request for continuance to warrant habeas relief, "not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process." *Brown v. O'Dea*, 227 F.3d 642, 645–46 (6th Cir. 2000) (citations omitted). As the trial judge correctly noted, counsel had been provided with sufficient time to prepare for the DNA suppression hearing. Thus, counsel's ineffective assistance notwithstanding, the trial judge's decision in this regard was neither an abuse of discretion, nor constituted a violation of due process.

## VII. Denial of the Right to Appeal

As noted above, Petitioner's application to the Michigan Supreme Court for leave to appeal was denied. Petitioner asserts that this decision deprived him of the right to appeal.

As the Supreme Court has recognized, there exists "no per se constitutional right to appeal." *Chaffin v. Stynchcombe*, 412 U.S. 17, 25 n. 11, 93 S.Ct. 1977, 36 L.Ed.2d 714 (1973) (citations omitted). However, once a state "establishes an appellate forum it must assure access to it upon terms and conditions equally applicable and available to all." *Id.*

While Petitioner was certainly entitled to seek review in the Michigan Supreme

Court of the decision by the Michigan Court of Appeals affirming his conviction, the decision whether to accept for review Petitioner's appeal, is a matter within the discretion of the Michigan Supreme Court. *See* Mich. Const. art VI, § 4; Mich. Comp. Laws §§ 600.212, 600.215; M.C.R. 7.301. There is neither evidence nor allegation that this discretion was exercised in an improper manner. Accordingly, I find this claim to be without merit. *See, e.g., United States v. De Robertis,* 565 F.Supp. 327, 338 (N.D.Ill.1983) (in the absence of evidence that the state's appellate review system "makes distinctions that are violative of due process or equal protection," the fact that the state supreme court declined to review the petitioner's conviction cannot form the basis of habeas relief) (citations omitted).

### *CONCLUSION*

For the reasons articulated herein, I conclude that Petitioner is being confined in violation of the United States Constitution. Accordingly, I recommend that Leonard's petition for writ of habeas corpus be **granted.** I further recommend that the State of Michigan either release Petitioner from custody or afford him a new trial within 120 days.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

Respectfully submitted.